Now you want to reserve four minutes for rebuttal. Is that correct? I do, Your Honor. That's correct. Okay. You may proceed. May it please the Court. In addition to Your Honor's questions in this patent case, Your Honor, I'd like to explain today how our position on three issues, the two invalidity defenses and the Court's claim construction, should lead this Court to conclude that the summary judgment was legally misplaced and should be reversed. We should be going back for a jury trial in this case. First is to invalidity. The District Court essentially made the same mistakes both in its new matter analysis and in its on-sale bar analysis, that being first it failed to apply the precedent of this Court. Specifically on the defense of new matter, the Court simply reversed the burdens of proof. The District Court misassigned to Hamilton Beach the burden of persuasion rather than the simple burden of production, and it wrongly required Hamilton Beach to conclusively establish, its words, establish the priority of the 928, the patent in suit, rather than simply point to a jury question on that issue. On the defense of on-sale bar, the District Court ignored this Court's instruction that the Court had to compare the allegedly anticipating prior art to the claims of the patent in suit. It never did that. So in both situations, the District Court ignored precedent to this Court and then ignored substantial evidence favoring Hamilton Beach, upon which a reasonable jury could conclude there was no basis for Sunbeam's invalidity defenses. The District Court cited power releases, this Court's decision to power releases in its new matter analysis, and said that Hamilton Beach was required to establish priority, in other words, to prove that the 928 did not contain new matter. And that flatly contradicts the later holding of video tech, which this Court clarified power releases, and that decision makes clear it's Sunbeam's burden to prove that the 928 patent contains new matter, and that that burden of persuasion never shifts. On that issue, did the burden really seem to make much difference to the District Court's analysis? Well, I think it did, Your Honor, because the Court asked us to establish that there was no new matter in the 928, when all we were required to, all we should have been required to do, is come forward with some evidence, some argument showing there's a question as to this. And we did that. We did that. We had evidence in the original specification. We had testimony from an expert witness, and extrinsic evidence, documents and testimony from Hamilton Beach's own inventors, all supporting the concept that at the time of the 828 application, the inventors knew of the invention that subsequently was claimed, and the 928. And we addressed that evidence in the brief, Your Honor. So, in a sense, perhaps it may not be reversible error, per se, for the Court to have misapplied the burdens of proof, but I think it certainly caused it to skew its analysis when, on summary judgment, it should have been holding the evidence, viewing the evidence in a light favorable to Hamilton Beach. And it failed to do that because it had assigned to us the ultimate burden to establish priority. That was the error that it made with regard to the burden of proof. All right. Can we move on to the on sale bar issue? Certainly, Your Honor. On sale bar, the Court again made a legal error. It failed to follow the teaching of this Court in Dana Corporation that the first thing you do is you determine whether the subject of the barring activity meets each and every limitation of the claim. You have to determine that what's alleged to be anticipating actually is an embodiment of the claim dimension. All the District Court did in this case was say the model number of the product that the purchase order in question from the supplier considered, that was the same model number assigned to the product that actually went on sale at a later date. No more. There was no analysis of the features of that product compared to the limitations of the 928 patent. And that's something that Dana could not be more clear. That is reversible error because it deprives this Court of the opportunity to review that decision. What does the evidence show for the missing limitations from the product that was the issue in the first, let's say an issue with respect to the Chinese supplier and the purchaser? The evidence shows, if I can quote the patent, it was incapable of selectively retaining the lid and sealing engagement. Put simply, it leaked. The core concept of this invention is portability. This is a slow cooker that the lid clamps down, it forms a sealing engagement, you can make a pot of chili, you can carry your slow cooker, put it in the floorboard of your car and drive to the church picnic without fear of it slopping around. But isn't there a distinction between whether or not you ordered something, assuming there was an order, that didn't leak or that they offered to supply something that didn't leak and whether they ultimately were able to do that with respect to the first iterations that were provided? Well, I think that gets to Sunbeam's argument that we're just quibbling about whether it worked, that you actually had a product that anticipated. We did not. At the time that purchase order issued, and there's a factual dispute over, as you intimated, whether that actually was a real offer. We contend it was not. But at the time that purchase order kicked out of the computer system, they didn't have a product that retained the lid and sealing engagement. It hadn't been done. In fact, it was months thereafter, continued tooling, continued changes to the product in question  But aren't those just the kinds of changes subsequent to an order? Again, assuming there was an offer or an order, aren't those kinds of changes the very same kind of changes that we said in weather cam don't alter the determination as to whether or not the on-sale bar applies? Well, Your Honor, those are the kinds of changes. No, they're not, and here's why. The kind of change we're talking about here is meeting one of the core limitations of the patent, which they simply had not been able to do. They had not cracked that nut at that stage. So this isn't a situation where it's, well, it works fine. We think we'll be able to go to market with this. Let's change this. Let's change this. Let's make some immaterial modifications. This is the key to the invention. If this leaks, this is not a stay-or-go or a cook-and-carry, whichever the parties are going to call it. This is not a portable slow cooker. What's the evidence as to the leakage and the degree and nature of the leakage in the original, well, either purchased or not purchased product? The supplies that were coming in before the critical date from the supplier, nine of ten that they had received did not meet that critical claim limitation, nine or ten. So one did. One did. You're absolutely right. Well, if one did, then if it's a sale, then one was sold that satisfied the claim limitations, right? There's no indication in the record of what had happened to prevent that one from leaking. There's nothing in the record. It didn't leak. Well, that— If the evidence shows it didn't leak, then it seems to me that you have a product that was, if it was sold, it was sold. It didn't leak. Well, but the record also contains plenty of evidence that they made continued changes, that they were continuing to change the tooling of the product. They were continuing to be dissatisfied with what was coming out from the supplier well after the critical date. There's nothing to indicate that they were able to replicate that whatever—perhaps it was a fluke. We don't know. There's nothing in the record. Whatever had led that one model to not leak was not something that was readily repeated. It's not something—there's certainly a factual dispute on that issue, Your Honor. The—also on the on-sale bar issue, Sunbeam was raised in its opposition brief. It's challenged the district court decision as to customer communications. A number of shows, some presentations that were made to customers. And the only point we would make on that, Your Honor, is a note of agreement with the district court. That is not enough to raise—to show commercial offers for sale. Can I return—sorry to interrupt. No, that's fine. Let me return to the Chinese supplier. Sure. You said earlier, I think, that what was required was an offer, which is right, I think. But curiously, both briefs and the district court seem to view what's required as being an enforceable contract. That's not correct, is it? It has to be something that would form the basis of a commercial contract. Right. So if I make you an offer to sell my car, that is on sale. Even if you have all sorts of reservations that you would insist on before agreeing to purchase the car. But there's a difference in this case. Before you get into distinguishing this case, that's the proper way to look at the on-sale car issue, right? An offer which, if accepted, could form a contract. Could form the basis of an informal contract. There's no question about it, Your Honor. So the district court is wrong in talking in terms of contract. Well, I think the district court is wrong if it suggests that you have to have an enforceable contract to constitute an offer for sale. You have to have something that can form the basis of that. Now, in this case, we didn't, for the reasons that we've outlined in the brief chiefly. The primary controlling agreement between Hamilton Beach and its supplier said there can be no delivery. There is no offer until we've actually granted you the release, the permission to produce this. And there's no question that that hadn't occurred in this case. But Hamilton Beach was in a position to grant the release, right? They could say, with respect to the first shipment, we're good. And then you've got a contract, right? So they were in a position to accept the offer, correct? They just had the right not to. Well, if the offer was the purchase order that was issued by Hamilton Beach. No, I'm thinking of the offer being, I know the name of the supplier is confidential. We'll just say the Chinese supplier. Thank you. If the Chinese supplier is responding the purchase order and saying, here's what we're prepared to send you. Why isn't that an offer? Which Hamilton Beach could say, we'll waive all of our special conditions and underwriting, writers, laboratories, testing, and so forth. We'll take it. You've got a contract, haven't you? Well, the supplier's response could be an offer to contract. Right. It could be. Why not? Well, it isn't in this situation because the supplier, in the very email that the district court acknowledged, said, we know we can't do anything. We know we can't begin production until you, Hamilton Beach, have given your release. Well, that's my way of saying, I'm not going to give you my car until you send me the check. But that doesn't make my offer to sell you my car any less an offer. Right. Well, you also have all the evidence in the record, Your Honor, that there's no evidence of acceptance before the critical date. But there doesn't have to be acceptance, right? All there has to be is an offer. Well, we would argue, Your Honor, that the offer has to be one that under the terms of the party's relationship could be accepted. Why couldn't you accept it? Sure, you had the right not to accept it, but why couldn't you? Because of the party's relationship, the controlling documents prohibited that. Hamilton Beach was not prepared to give a release. Not prepared to give a release? That doesn't mean it was not entitled to. Well, they would have been entitled to order a product at any point. The point is, Your Honor, that they knew that this was not a product they could put to market. Explain to me, it's 5194 of the adjoining appendix. There is the corporate purchase agreement. And paragraph 3 says, the buyer's purchase order shall serve as release documents against this CPA. What does that mean? That's precisely what we're talking about, Your Honor. That an accepted purchase order could be considered a release. And that's not what happened here. But it doesn't say an accepted purchase order. It says the buyer's purchase order shall serve as a release. One second, Your Honor, just a minute. Right, each such purchase order shall specify the exact product. This is the point we're talking about, Your Honor. The purchase order shall serve as a release document. But the parties knew their continued communications. There was communication about that release not having occurred. There was confusion about how many orders were to be shipped, what the price would be, other things that are referred to in that paragraph about what the release will constitute. What had been kicked out of Hamilton Beach's computer system simply wasn't apt for the situation that the parties were in. And that's why there was subsequent communication. Why it was months before there was actually, in addition to a product that worked, there was actually general agreement between the parties that, yes, now we have the deal that we can go forward. That's when you have the contract. All right, you're out of time. We'll save you rebuttal. Thank you, Your Honor. Thank you, Your Honor. Good morning, counsel, and may it please the court. In the court's 40-page decision, it set forth evidence, detailed evidence, that enables this court to review de novo exactly what occurred in this case. With regard to new matter, the court got it right. With regard to the fact of the court's reliance on Power Oasis, no one denies that the court repeated language from Power Oasis that says you can place the burden on a plaintiff to come forward with evidence to prove entitlement. But then when you look at what the court actually did, the court went back and said clear as day, and this occurs at appendix pages 38 through 44, it is Sunbeam's burden to prove invalidity by clear and convincing evidence. The court went ahead and did and said specifically that should Sunbeam meet his burden of establishing a prima facie case of invalidity, then Hamilton Beach is obligated to come forward with evidence to the contrary. It does not say that somehow there's a shifting of the burden as refined in the Videotech case. The court went on finally to note that the 831 patent, which changing the catch, changing all that language by way of a continuation in part application instead of a continuation, and the explanations for it after page after page after page of evidence strained credulity. The court applied Videotech. The court went through and made sure that the burdens didn't shift. The burdens of coming forth with evidence certainly shifted, but the ultimate burden of proof never did shift. But the court, I mean, we are in a summary judgment context here, and the court says it strains credulity, but is the court supposed to be making credibility findings at that point? With regard to looking at the evidence that was submitted by plaintiffs, the court is in a position to determine whether or not a reasonable juror could reasonably support the position. And what the court did is it looked at the changes in the spec, the changes that were never underscored, that were never highlighted to the examiner. It looked at contradictions in the underlying 831 spec where a clip was one thing one day and then changed to something else the next day so that plaintiffs could point to the claims and say, oh, a part of the clip was on top of the lid all along. The court looked at evidence as to over five years of purported designing, the fact that no one, but no one at Hamilton Beach, had ever thought of coming in with a clip assembly on the lid. It looked at Swenger's expert testimony that talked about the incredible differences in design. No one at Hamilton Beach had ever thought about that. There was some evidence that… There was one item where one individual, not the inventor, said… Yeah, but they were at Hamilton Beach, right? It was with Hamilton Beach, but… Right, so your statement that no one at Hamilton Beach had ever proposed putting a clip on the top of the lid, right? Your Honor, no one had proposed putting a clip on top to cooperate with a catch on the side of the housing. The unit that was described in this one email by a non-inventor specifically said, what if we put a clip on over the center of the clip on the lid to cooperate with the crock, that's the ceramic piece that goes inside, so that you could remove it and put it in the refrigerator. It had nothing to do with the cooker. Nothing to do with the housing of the cooker. That's a huge distinction. In fact, over five or six years, not one sketch, not one suggestion from Hamilton Beach, and frankly, over two and a half years, not one sketch, not one ability to arrive at that from Sunbeam either. It was only through the care of attempting to design around that someone finally came up with a better mousetrap. Someone came up with an idea that took nine more months, 10 more months to actually reduce the practice and develop into a product that worked a whole lot better and sold a whole lot more. There's nothing inherently improper about amending claims to try to read on a design around. That's correct, Your Honor. Two things have to exist, though. There has to be support in the spec, and you have to be the one who invented that, and in this case, neither existed. There was no support in the spec. If it's in the spec, you did invent it. Well, you could have invented it. That's what it means to say it's in the spec. Well, you could claim that, but if you invented it but didn't put it in the spec, you're still missing support. Right, but if you put it in the spec, you invent it. If it was there in the spec and it had priority, that's correct. In this case, they don't have priority. They can't establish priority, and for that reason, the patent was appropriately found with all the evidence that came in to be invalid, just as that evidence has been laid out in 40 pages for this panel. Now, the court has seen the abstract, the color red lines from the abstract. The court has seen the testimony that refers to the definite. By red lines, you mean the changes that were made between the earlier spec and the second spec. Yes, carefully, by the way, not to the detailed description where someone could check, but rather to the abstract and to the summary of the invention where typically the PTO doesn't check. The court has seen in the 831 spec the fact that there, the catch that's on top engages the clip 22 and the hook of the clip 22A to lock things in place. Now, all of a sudden, the definition of clip has changed where the catch on top of the lid is the clip, and we're to believe that the clip is supposed to engage the clip now to close the slow cooker. That's what happens when you start changing definitions to be able to make it read on someone else's design, a design that was not invented by that particular company. Now, the court referred to a few other things. Mr. Tyler referred to the fact that nowhere, absolutely nowhere, supposedly, did anyone come forward and confirm that the product that was being sold in 2005 corresponded to the claims. And by the way, your honors, the claims don't call for sealing something liquid-type. It calls for sealing it merely to inhibit leakage. The difference between water-resistant and waterproof. So this claim that if you shook it hard enough and turned it over, there could be some leakage and nine out of ten could leak, under that criteria, the claim doesn't call for that extent of leakage according to the term. The fact of the matter is, though, is, in fact, there is proof that the 928 patent covered what was being sold in 2005. We showed all the advertising to the court that talks about the existence of a gasket. After all, all this is is a slow cooker with an over-the-center clip on top. It describes, all the advertising described the gasket, the clips for portability to reduce spillage in every advertisement from 2004 to 2005. And Mr. Tidy swore out in a declaration that the product that was sold in 2005 not only corresponded to the 928 patent at Appendix 190, he confirms it. Under oath, he claims that it also was covered by the 831 patent, which, by the way, was never enforced against Sunbeam's device. Well, let me give you a hypothetical. What if I offer to sell you a car, as Judge Bryson referenced before, but I have absolutely no ability to build a car? I couldn't possibly make a car if I wanted to. Is that a commercial offer for sale? I don't believe it is. Okay. I don't believe it is. Again, the commercial offer, you've got to have certain prongs there. You have to have a commercial offer, and the device has to be ready for patenting. So the second prong would be missing. If someone doesn't have a clue as to what the design should be, they're not in a position to be able to patent it. Maybe someone who has the capability to make a car could look at the patent and actually make the car. But I, as a manufacturer, am incapable of following that patent properly. Does that mean it's not a commercial offer? At that point, I'm not sure who the inventor is on that one. If the person making the offer wasn't capable at all of even describing design parameters, I'd say there's a problem there. I'd say there has to be a problem. Who do you think is the offeror in the fact that we have before us here? The offeror in this case is the Chinese manufacturer. I could say the name, but I'll hold off doing that. The Chinese manufacturer had received all the specifications for the product from Hamilton Beach. Hamilton Beach's engineers, as of February of 2005, had agreed to go ahead and produce dyes and tooling, and they were putting together prototypes by February 25th, again before the crucial date, with what came off of those tools and dyes. They stated under oath that they knew it would work. So in this particular case, you've got Hamilton Beach turning over all the information to the Chinese manufacturer to make it. The Chinese manufacturer agreed, they offered to make it, and Hamilton Beach came back with a purchase order. And in that case, I agree with what the court was saying. I don't believe, we don't believe, that you have to have a complete transaction, a contract that guarantees everything across the board. It's an offer for sale. In this particular case, we had a completed contract, and 90% of the contracts in this country are subject to change after the fact. Colors change, quantities change, prices sometimes fluctuate. The fact that it did that, and all this product had to do was inhibit leakage, and it did that, and it did it well, especially with the engineers being satisfied on February 25th that it would work as promised off the tools and molds. We have a sale, just as we had a sale on that ShopCo offer. By the way, these are commercial units. 1,950 units for the Chinese manufacturer, 700 units for ShopCo even earlier than that, where ShopCo was sold. I think some of the names of the companies are confidential also. Why that is, and why we have to have these extensive confidentiality claims, I'm not sure, but if you're going to have them, you probably should respect them. That particular S company that we reference in there, in that particular case, unlike the other 27 offers that were made and chronicled for the court, under the S company, not only was an offer made for 700 units, a commitment came back on it. Now, whether it was a purchase order or not, a commitment to the point where the manager of marketing congratulated the sales people for acquiring the commitment. Way to go for securing the commitment. If that's not responsive to an offer to sell, I don't know what is. So on both hands, the Chinese manufacturer and the S company, I believe we've got evidence of sales well before the factor, well before the crucial date. Again, the court recognizes that you don't have to have an enforceable contract. Well, the court ruled against you on that point. Of course. The court's recognition worked against you on that issue. Don't we have a distinction here between an offer to sell and an offer to buy? According to the court, the court imposed the higher burden. It not only wanted to see an offer to sell, but it wanted to see an offer to buy come back, claiming that in this particular industry, that's what's expected. We don't believe that that's the appropriate criteria, and thus the S company transaction holds as an offer to sell as well. But in this particular case, in view of the lack of an exception to the supplier from the Chinese company, yes, what you had is you had an offer to buy, go to China, an offer to sell, come back, and the issuance of a formal purchase order from Hamilton Beach to the Chinese manufacturer. You had all three. And for that reason, clearly, before the crucial date, you had a sale. You had an offer to sell. Anything else? Yes, Your Honor. Counsel didn't go into the claim construction, but I think it's important to note, as we mentioned, that starting at pages 3848, appendix 3848 through 3850, I believe, the first time that Hamilton Beach, during the prosecution of the 928 patent, starts attempting to distinguish the structure of their clips over the structure of the prior art clips is at 3849 when they attempt to distinguish over Sprague, admittedly in Claim 3. The only thing they ever mention prior to discussing distinctions between the clips is the fact that you don't want to pour hot soup on a camera. You don't want to melt a camera case. But when they start going into the distinctions, on seven separate occasions, they talk about the importance of a cooker as having a substantially horizontal lid and a substantially vertical side. If we were to disagree with you on claim construction, would that impact the invalidity analysis under either of the grounds that you asserted? Not at all, Your Honor. Neither. In this particular case with Mr. Tidey confirming that the exact product conformed to the 928 patent and the 831 patent at appendix 190, and with regard to all the advertising that confirmed that every single feature, oh, and pictures, by the way, which just look almost exactly like the drawings of the 928 patent, that's really not relevant at all. The only thing that that impinges, that that really addresses, is the issue of non-literal infringement, which we believe should also be non-literal. Doesn't it affect the decision to issue a new matter? I don't believe it does, Your Honor. I don't believe it does. None of the claim construction issues that are in controversy, which is just one, which is the issue of the hook, that's the only one in controversy, none of the other issues of claim construction are controverted. And for that reason, with regard to the new matter, you could see exactly what was added, and it's with regard to uncontroverted claim elements. So claim construction is important in general, of course, as to whether new matter was added and the nature of the new matter, but none of those issues on that new matter are in controversy. So for that reason, it has no effect at all on the invalidity positions on the on-sale bar or the addition of new matter, which we believe the Court likewise chronicled for this Court's de novo review to be able to see exactly how the new matter was added and what it did. Okay. Thank you. Thank you, Your Honor. Your Honor, it's clear that the issue of whether a patent improperly claims new matter is a question of fact. And what you've heard from Mr. Harris is a litany of disputed fact. And on summary judgment motion, those should have been weighed in favor of Hamilton Beach and not weighed against Hamilton Beach, as was done here. There's no indication that whatever change was made, if any, to the definition of CLIP in the 928 had any relevance to the patenting of that invention. The inventors relied upon the disclosure of the earlier 831 patent. Why did you feel the need to amend the specification? It was the – oh, why would the terminology change? That's simply not in the record, Your Honor. I can't answer that question for you. What I can tell you is that the patentees did not rely upon those changes. They relied back to the original disclosure to justify the invention. And I can also tell you that there is plenty of evidence in the record, factual evidence showing that Hamilton Beach was in possession of the invention, inverting the configuration, if you will, at the time of the original patent application. There really, as far as I could see, in terms of the intrinsic evidence in the original patent, there seem to be two points that you rely on, and you tell me if there are any more. One is the preferably language, and you know what I'm talking about. I do. The other is the claim differentiation point. That's true. Is there anything else? No, those are the arguments. That's it. So other than that, it's just your expert and your e-mail, right? The e-mail within Hamilton Beach that says we could put the— And the testimony of the inventors that they possessed the invention at the time. Right, okay. You've got two inventors testifying. Right. You've got the internal e-mail. You've got Sunbeam's own witness testifying that it would have been an insubstantial change. Ah, but insubstantial change is not the same as disclosure. It's a question of fact, Your Honor. It's another piece of evidence that should be weighed in favor of Hamilton Beach on a summary judgment motion. That's the critical distinction here. Okay. This is summary judgment. This is an issue that a minimum should have gone to the jury. Instead, the court, we submit because of the way it approached through the burdens of proof, came at this the wrong way, and the evidence was held against Hamilton Beach. Okay. And I would note, Your Honor, and we cited this in the brief, we're not the only ones who have drawn that conclusion about what was in the original disclosure, that that's also been the conclusion of PTO in response to the re-exams. And the parties dispute whatever the relevance and how much weight you can put on it. It's there, and the court can take judicial notice of that distinction, which is why we brought it to your attention. Claim construction, Sprague, Your Honor, it was a distinction made purely for the purposes of Claim 3. It distinguishes Claim 3 only, and the reason that is done is to show that unlike a camera case with a vertical side, the slow cooker has generally two planes, a lid and a sidewall. There's no indication that that was intended to be a definition of hook throughout the patent. No indication that that was intended to say it has to be virtually a 90-degree angle on the latch, the clip mechanism. There's no indication of that whatsoever. All the inventors were doing was specifying that unlike Sprague with its wall here, you've got a mechanism that exists in generally two planes. What's the answer to the question that I posed to your friend on the other side, which is if we agree with you on claim construction, disagree with the district court, does that impact the validity analysis at all? Not coming in, but coming out, because we submit there are so many questions of fact, both on On Sale Bar and Ask the New Matter, we think it means this case goes back for a trial. If you correct the court's claim construction, not only do we have a live DOE case, but we ought to be going to trial on the issues of invalidity in this case. There are jury issues there. So it doesn't change the party's positions coming in the door. It doesn't change his argument. It doesn't change mine. We just have different positions. It doesn't change the validity analysis. You're just saying that if you win on validity and the claim construction changes, then you win on infringement, so you go back to a trial of everything. I think that's right, Your Honor. It doesn't change my view of what the claims cover. Okay. There's nothing further? Thank you, Your Honor.